

**SIGNED this 24th day of January, 2011.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ANTONE'S RECORDS, INC., | § | CASE NO. 08-12292-CAG |
|     Debtor. | § | Chapter 11 |
| | § | |
| TEXAS CLEF ENTERTAINMENT GROUP, | § | CASE NO. 08-12293 |
| INC., | § | |
|     Debtor. | § | |
| | § | |
| TEXAS MUSIC GROUP, INC., | § | CASE NO. 08-12294 |
|     Debtor. | § | Jointly Administered Under |
| | § | Case No. 08-12292 |

| | | |
|---|---|---|
| ALLEN RAY WALSER, et al. | § | ADV. NO. 09-01010- CAG |
|     Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS MUSIC GROUP, INC., ANTONE'S | § | |
| RECORDS, INC., RANDOLPH W. | § | |
| CLENDENEN, HEINZ GEISSLER, | § | |
| JAMES W. HELDT and TEXAS CLEF | § | |
| ENTERTAINMENT GROUP, INC., | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION

### BACKGROUND

Plaintiffs[1] in this adversary proceeding are the family and estate of musician, Don Walser.  (December 20, 2009 Report and Recommendation Regarding Plaintiffs' Motion to Withdraw the Reference at p. 2, Docket No. 18.)[2]  This action was initially filed in Texas state district court but was removed to this Court on February 17, 2009, following Debtors'[3] bankruptcy.  *Id.* at p. 3. Plaintiffs contend that Debtors failed to pay Don Walser certain royalties under a Recording Agreement executed in 1994 between Don Walser and Watermelon Records, Inc.  Plaintiffs' First Supplemental Petition ("Petition") at ¶ 4.9, Docket #6-3.

Don Walser was a country singer known for his distinctive yodeling and singing voice.  He composed and recorded albums pursuant to a recording contract with a record label, Watermelon Records ("Watermelon"), which was owned by Heinz Geissler ("Geissler").  After Watermelon filed Chapter 11 bankruptcy in 1998, Watermelon sold its interest in the Walser master recordings through a bankruptcy sale to Debtor Defendants who are the subject of this adversary action, and who employ Geissler as their label group manager.  1:137, 155.[4]

Antone's Records, Inc., Texas Music Group, Inc., and Texas Clef Entertainment Group, Inc. are three Austin-based record labels in the business of recording and selling music created primarily by Texas and Austin musicians.  On November 18, 2008, Antone's Records, TMG,

---

[1] Plaintiffs are Walser's surviving children and representatives of his probate estate.

[2] Pursuant to the District Court's request on whether the reference in this case had to be withdrawn, this Court had to determine the extent of its jurisdiction.  Pursuant to the Court's Report and Recommendation (Docket #18), the Court recommended (and the District Court accepted) that the District Court decline withdrawing the reference.  As such, the Court found that the majority of the matters at trial were core in nature.  *See* 28 U.S.C. § 157(b)(2).  Report at 6.  Further, the Court found that should any non-core matters remain after trial, i.e. tort claims, that those matters would be referred to the District Court.

[3] Debtors refer to Antone's Records, Inc. ("Antone's Records"), Texas Music Group, Inc. ("TMG"), and Texas Clef Entertainment Group, Inc. ("Texas Clef").

[4] A transcript of the trial can be found on PACER at docket nos. 57 (Vol. 1), 56 (Vol. 2) and 59 (Vol. 3).  The reference 1:137 denotes Volume 1, page 137.  This convention is used throughout the Court's Memorandum Opinion.

and Texas Clef  filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Debtors' cases are being jointly administered.

Defendant James W. Heldt ("Heldt") is a benefactor of Antone's Records, TMG, and Texas Clef.  Heldt was not involved in the day-to-day operations of the Debtors.  2:202:23-25; 203:8-12.  Randolph Clendenen ("Clendenen") served as President of the Debtors.  2:229:8-9.

Despite not being involved in day-to-day management of the Debtors, Heldt was committed to Debtors' success and wanted them to survive, loaning them millions of dollars, which remain unpaid.  2:203:19-21; 226:17-22; 227:10-20.  According to Debtors' Statements and Schedules, Heldt is owed $440,400 by Antone's Records, Inc., which was an amount documented in promissory notes and acknowledged by the Debtors.  D Ex. 52. [5]  Heldt was also owed approximately $135,000 by Texas Clef.  D Ex. 54.  According to Antone's Records' internal accounting, Heldt loaned it approximately $3,000,000.  D Ex. 56; 2:203:19-21; 226: 17-22.  In addition, the tax returns for Bamba, Inc., the parent company of Antone's Records, reflect loans of approximately $3 million.  D Ex. 44.  Plaintiffs agree that Heldt provided approximately $3,000,000 of funding to the Debtors.  Plaintiffs' Pre-Trial Order, p. 11.

Heldt was never repaid these loans and at no point did he require Debtors to make loan payments.  2:227:10-24.  Also, he never drew a salary and was not paid dividends or any distribution.  2:181:15-18; 3:65:12-22.

This adversary proceeding involves Plaintiffs' attempt to rescind the contract regarding Walser's albums *Rolling Stone from Texas* and *Texas Top Hand*.  Plaintiffs also seek a claim for breach of contract, and breach of fiduciary duty on the part of the Defendants.  Additionally, Plaintiffs assert that the corporate veil should be pierced with respect to Defendants Geissler, Clendenen, and Heldt, and that they should be held liable for Plaintiffs' claims against Debtors.

---

[5] "P" denotes Plaintiffs' Exhibits and "D" denotes Defendants' Exhibits.

Finally, Defendants object to the proofs of claim filed by the Plaintiffs, asserting that $28,161.41 plus pre-judgment interest in the amount of $1,025.15, rather than over $300,000 (as stated in Plaintiff's Proof of Claim) is owed Plaintiffs. This adversary proceeding was consolidated with the Debtors' objection to the Plaintiffs' proof of claims. (Doc. #65.)[6] Debtors' Post-Trial Brief, P. 2, 10. In addition, Plaintiffs' expert witness, George Berry, valued Plaintiffs' opportunity loss at $182,646.05. 2:173; P Ex. 75B.

**FACTS**

Walser created several musical albums that were sold to Texas Music Group, Texas Clef Entertainment Group, Inc., and Antone's Records, Inc. through the Watermelon sale. One album, *Rolling Stone from Texas*, was created pursuant to a 1994 contract with Watermelon. 1:19; D Ex. 2. The second album in question, *Texas Top Hand*, was created in 1996 and Watermelon paid the recording expenses, released it and recouped money from it. 1:19. After creating albums for Debtors, Walser created work for two other companies who are not parties to this proceeding (including signing with London-Sire Records Inc. ("Sire") in June 1997). Plaintiffs' Post-Trial Brief, P. 10; Plaintiffs' Pre-Trial Order, P. 5; P Ex. 29.

Pursuant to its recording contract with Walser, Watermelon (and its successors) were required to provide Walser with semi-annual royalty statements. The uncontroverted evidence demonstrated that royalty payments and statements from Watermelon were provided on a spotty basis at best, despite contractual requirements to provide regular statements every six months, "in no event less than twice per year." 1:230; D Ex. 2, P. 13, para. 9.1. The Recording Contract provided that statements "shall be accompanied by the payment of the net amount of royalties, if any, earned by [Artist] hereunder during the accounting period to which the statement relates."

---

[6] Unless otherwise noted, all docket references herein relate to Adversary No. 09-01010. Docket #65 refers to the claims objection filed in 08-12292.

D Ex. 2, P. 13, para. 9.1.  Royalties due to other artists similarly situated to Plaintiff, after advances and other expenses were recouped, would be about 83 cents a unit.  3:32, P Ex. 54, P. 1.  When a record company pays for recording an album, it owns the master recordings.  1:56.[7]

Heinz Geissler once owned Watermelon Records, and he founded the company along with two others, Kunz and Keane.  1:62-64.  During the period prior to filing bankruptcy, Walser indicated that he did not want to work with Geissler anymore.  Geissler managed the day-to-day operations of Watermelon and looked for artists to sign.  After the Watermelon bankruptcy concluded, Heinz Geissler, as label group manager for Debtors, worked for all the Debtor entities equally.  1:137, 155.  Geissler is not a shareholder in any of the Debtors, simply an employee.

Watermelon Records filed for bankruptcy protection on December 31, 1998,  D Ex. 22, P. 1, and its Plan was confirmed on April 23, 2001.  D Ex. 22, P. 37.  After the Watermelon bankruptcy was filed, Watermelon did not tender any more royalty statements during the bankruptcy.  1:135-36.

During Watermelon's bankruptcy, Walser did not make any claims for rescission or non-payment of royalty.  1:217; Debtors' Post-Trial Brief, P. 2, Plaintiffs' Pre-Trial Order, P. 7.  Pursuant to the Plan, Watermelon's rights to *Rolling Stone from Texas* and *Texas Top Hand* were transferred to Debtors.  1:136; P Ex. 21; P Ex. 22, P. 1.  Debtors and Texas Music Group reissued both works on August 21, 2001.  Plaintiffs' Pre-Trial Order, P. 7.  On October 30, 2001, TMG released *Dare to Dream: The Best of Don Walser*, which contained recordings from the

---

[7]  As noted herein, the Debtor had recording contracts with a number of artists.  Two artists, Tish Hinojosa and Guy Forsyth, similarly challenged the Debtors' breach of contract for failure to remit semi-annual royalty statements per their recording contracts.  Characteristic of Debtors' behavior here, Debtors failed to remit royalty statements on a timely basis.

Tish Hinojosa sought rescission of her recording contracts and pled a return of her masters to her.  The Court denied her request based on limitations, denied her request for a constructive trust, and denied rescission under the Texas Occupation Code.

The Court granted the Debtors' objection to Guy Forsyth proof of claim due to a lack of evidence but denied the Debtors' objection to the claim of Monkey King Music for mechanical royalties.  The Court did adjust the amount of the proof of claim.

two works and selected recordings of Don Walser that were licensed from Sire. Plaintiffs' Pre-Trial Order, P. 7; see also P Ex. 32, P. 4 (demonstrating in Watermelon's settlement agreement with Sire how Debtors acquired the rights to use Walser's Sire recordings).

It is undisputed that Debtors failed to provide timely royalty statements to Don Walser. 1:229; Debtors' Post-Trial Brief, P. 2. Walser and his manager, Nancy Fly Guenther ("Fly"), requested royalty statements from Debtors, Geissler, and Clendenen on several occasions, and these statements were not provided or they were provided months or years later. 1:230-31. Although Walser's works were reissued in August 2001, the first royalty statement Walser received from Debtors was in April 2004. Clendenen does not recall if Fly asked him for a royalty statement in 2004. 2:120; 1:230; see Plaintiffs' Pre-Trial Order P. 8. Defendants made several payments, unaccompanied by royalty statements, in November 2001 ($1,250) (D Ex. 27, P. 031931), December 2001 ($1,250) (D Ex. 27, P. 031930), December 2003 ($1,500) (D Ex. 27, P. 031929), and February 2004 ($1,500) (D Ex. 27, P. 031928); Plaintiffs' Pre-Trial Order, P. 8).

Additionally, a movie starring Robert Duvall -- *Secondhand Lions* -- used two of Don Walser's songs and was released in 2003. The production company paid $32,370 in licensing fees for the recordings of Don Walser between July and October 2003. D Ex. 32, P. 3; *See also* P Ex. 37 (reflecting check payments for use of recordings in *Secondhand Lions*).

Tristan Ader, an Antone's employee who provided testimony regarding the royalty accounting at Antone's remarked that most sales occur when an album is initially released and then sales activity declines over time. 3:26. Ninety percent of the sales for *Texas Top Hand* appear to have occurred in the first six months of its reissue. 3:29, 3:31; P Ex. 68, P. 1. However, Ader noted that distributors are permitted to return albums (3:29), and if Walser was in

a "recoup position,"[8] he would not be owed a royalty until that recoup position was repaid.  3:31.

Additionally, Ader claimed that Debtors gave Walser a $2,500 advance and until royalties due

exceeded that amount, Debtors would not need to pay Walser.  3:32.  According to the recording

contract, Debtors were required to send a royalty statement for all six-month accounting periods,

including those in which little or no cash was owed to Walser.  Ader admitted that Walser should

have received regular accounting statements, but they were not provided.  3:38.

Counsel for Plaintiffs, Craig Barker, wrote a letter on March 29, 2004, requesting past-

due royalty statements.  P Ex. 38.  When the first royalty statement arrived on April 3, 2004, it

was not a semiannual statement, as was required by contract; instead, the royalty statement

covered several years.  1:230; P Ex. 49.  The cumulative royalty statement reflected a balance

owed to Walser in the amount of $8,713.11.  P Ex. 49; D Ex. 30.  The statement was

accompanied by a check payable for $2,000.  2:195; Defendants' Exhibit 27, P. 6.

Pursuant to the recording contract, Barker gave notice of default on May 5, 2004, which

provided Debtors a thirty-day period to cure.  2:86; P Ex. 39; *see also* D Ex. 2, P. 16, para. 13.4.

> [N]o breach of the agreement on the part of Company or you shall be deemed
> material, unless the party shall have given the other paty [sic] notice of such
> breach and such party shall fail to . . . otherwise cure such breach within thirty
> (30) days after receipt of such notice if such breach is reasonably capable of being
> fully cured within such thirty (30) day period; or, if such breach is not reasonably
> capable of being fully cured within such thirty (30) day period, if the party
> commences to cure such breach within such thirty (30) day period, and proceeds
> with reasonable diligence to complete the curing of such breach and cure such
> breach in a reasonable time.

On June 1, 2004, Barker sent a letter that disputed the balance, claiming that Walser was

owed $12,412.48.  2:90; P Ex. 41.  The thirty-day cure period for the May 5, 2004, default

---

[8] The recording contract provides in part that the recording label may recoup certain costs of record production against royalties owed the artist.  Further, as is customary in the music industry, artists could be advanced compact discs ("CDs") for sale at concerts.  The costs of CDs, depending on the recording contract, can be recouped against payment of royalties.

expired on June 4, 2004, without Debtors curing their default.  2:87, 195.  On June 7, 2004, TMG amended their royalty statement and sent it to Walser (dated June 6), reflecting a balance owed of $10,830.61.  D Ex. 33.  TMG finally tendered payment and another amended royalty statement on June 12, 2004, eight days after the cure deadline expired.  Plaintiffs' Exhibit 52; *see also* 2:195.  It does not appear that Debtors commenced to cure their breach within the thirty day period by paying any due amounts.  No money was transferred to Walser until eight days after the cure deadline expired.  2:195.

TMG's amended royalty statement reflected a balance owing $12,388.56, and the statement was accompanied by two post-dated checks payable to Walser that totaled $10,500.  2:90; D Ex. 34.  "They paid $5,250 on June 18, 2004 and $5,250 on June 22, 2004, both of which were after the cure deadline had expired."  Debtors' Post-Trial Brief, P. 3; Defendants' Exhibit 27, P. 4-5; *see also* 2:90, 195.  This left a balance remaining between $1,800 to $1,912.48 to $2,500 -- several numbers are provided at different times by parties, and testimony reflects that the calculation of royalties can lead to experts arriving at different monetary amounts.  2:195; Plaintiffs' Pre-Trial Order, P. 10.  Although the cure deadline expired, Walser accepted the June checks, as reflected by cleared check statements provided by the Debtors.  D Ex. 27, P. 031925, 031926.

Defendants were notified on March 10, 2005, that a lawsuit was filed on March 9, 2005.  2:196.  The balance due and the October royalty statement were subsequently sent to Plaintiff Barker in mid-to-late March 2005.  2:196; Plaintiffs' Pre-Trial Order, P. 11; D Ex. 35.  When Don Walser filed suit in state court, Debtors were delinquent in the amount of $2,888.57, as claimed by the Plaintiffs (noting that Debtors were delinquent in the amount of $1,888.56; however, Defendants' Exhibit 35 indicates that Debtors were delinquent in the amount of

$2,888.57). Plaintiffs' Pre-Trial Order, P. 11; D Ex. 35. On April 8, 2005, Barker and Plaintiffs notified Defendants that they rejected a check that was offered to them on March 25, 2005, that would pay Walser's royalties. Plaintiffs' Pre-Trial Order, P. 11; P Ex. 44.

Subsequent to the state court suit being filed, the Debtors tendered royalty statements and payments for all periods from January 1, 2004 through December 31, 2008. D Exs. 35-39, 42-43 and 46. All payments for periods after June 2004 were refused. 2:96. Debtors additionally offered to pay for half the cost of an audit of the royalty statements. 3:62; Debtors' Post-Trial Brief, P. 4. During this time, Walser never asked for an audit. 2:242. As of the bankruptcy petition date, Debtors earned profits of $90,590.31 on the Walser recordings after accounting for $20,600 in payments and credits to Don Walser. Debtors' Post-Trial Brief, P. 4; 2:68-69.

At trial, Plaintiffs provided expert testimony through George Berry as to the lost opportunity costs. Berry's April 2010 report valued Plaintiffs' opportunity cost loss at $182,646.05 (*see* 2:173; P Ex. 75B, P. 3), which is somewhat lower than Plaintiffs' $300,000 proof of claim, which appears to have been based on Berry's November 2008 letter to Plaintiffs' lawyers. P Ex. 75A, P. 2. Berry's November 2008 letter valued Plaintiffs' opportunity cost loss at $323,597, based on $237,164.59 owed in unpaid royalties to Walser from Watermelon and Debtor's bankruptcies. P Ex. 75A, P. 2. 2:175.

Dr. Berry's Lost Opportunity Cost Report ("Report") contains the following assumptions: (1) the applicable discount rate should be based on the 10-year Treasury bill rate; (2) damages from the Watermelon period are recoverable; and (3) that the Debtors' net profits are subject to being disgorged. As explained more fully herein, the only theory of law that the Court finds in favor of the Plaintiffs is a breach of contract theory; all other claims for relief are denied. Second, damages from the Watermelon period are not recoverable because Walser did not file a

proof of claim.  Third, under Texas law, the rate of pre-judgment interest in a suit for breach of contract is either the rate stated in the contract, or if the contract is silent, the post-judgment rate. ***Johnson v. Higgins of Texas v. Kenner Energy, Inc.***, 962 S.W.2d 507 (Tex. 1998); TEX. FIN. CODE § 304.003(c).

The post-judgment interest rate is equal to the New York Prime Rate with a floor of 5% and a ceiling of 15%.  TEX. FIN. CODE § 304.003(c).  The post-judgment interest rate is currently 5%.

As of April 30, 2004, the Debtors owed Don Walser the sum of $22,488.56 less prior payments of $10,100 for a net obligation of $12,388.56.  As of June 18, 2004, this balance was reduced to $7,138.56.  As of June 22, 2004, the amount owed was $1,888.56.  The Debtors were subsequently liable for the following amounts:

| | |
|---|---|
| 3/14/05 | $2,888.57 (which included the previous amount of $1,888.56) |
| 4/29/06 | $1,098.10 |
| 4/29/06 | $237.30 |
| 8/14/06 | $281.54 |
| 4/18/07 | $1,222.39 |
| 4/30/08 | $227.06 |
| 10/30/08 | $21,733.10 |

(Defendants' Exhibits 37-39, 42-43, 47.)

Because Debtors tendered payments for these amounts and they were refused, they are arguably not liable for pre-judgment interest on these sums.  However, the Debtors have included them in their calculation.  Interest stops accruing as of the petition date pursuant to 11 U.S.C.

§ 502(b)(2).  Based on the amounts owed, and the applicable interest rate, Defendants/Debtors owe Plaintiffs $1,025.15 in interest through date of petition.

### THE NON-DEBTOR DEFENDANTS AND THE RELATED RECORD LABELS

The evidence at trial indicated that Defendant James Heldt owned 65% of Texas Music Group, Texas Clef Entertainment Group, Inc., and Antone's Records, Inc.  Heldt has been described generally as the primary benefactor or source of capital for the Debtors.  Heldt remarked at trial that he contributed money to the Debtors because of his love of music, and the music scene in Austin.  Randolph Clendenen owned 35% of each Debtor and he worked as a contractor for Debtors from 1997 until the present.  2:128, 201.  His company, Frisco, acquired an interest in the three Debtors some time in 2008, three years after this lawsuit was filed.  2:128-29.  Prior to that acquisition, Antone's was owned 80% by Bamba Inc. and 20% by Cliff Antone.  2:129.  Bamba is owned by James Heldt and CRT Corporation.  2:129.  Texas Clef Entertainment Group and Texas Music Group were, prior to Clendenen's acquisition, owned 100% by James Heldt.

Heldt was never paid a salary, but he was occasionally reimbursed.  2:181-82; Plaintiffs' Exhibit 81.  Heldt incurred expenses related to travel where he would listen to bands that might eventually be signed by the Debtors.  No band was ever signed as a result of Heldt's attendance.  2:190.  Heldt's occupation is as an investor.  2:200.  There was no testimony as to how Heldt had accumulated his wealth or was able to advance large sums of money to the Debtors.  Heldt also owned companies other than Debtors.  According to Clendenen, Heldt did not have any role in the calculation of the royalty statements.  3:64.

Heldt paid Clendenen and his sole-proprietorship, Frisco Finance, from Heldt's personal checking accounts in consideration of Clendenen consulting Heldt on several ventures such as

Marlin Financial Service (a stored value card company), Renovac, and the Debtor entities. Plaintiffs' Pre-Trial Order, P. 12; 2:72-73. Clendenen's company was paid $10,000 each month, and Clendenen distributed $5,000 of the $10,000 directly to his salary each month. 2:74. Clendenen occasionally took bonuses from the company's profit, which was about $117,000 a year. 2:76. Clendenen was also reimbursed for business related expenses from Antone's. 2:76. Clendenen has been with Antone's since 1997. 2:122. His company, Frisco Finance Corporation, had no other employees and "[i]t really hadn't been very, very active until I was involved with Antone's." 2:74-75. Clendenen claims he worked approximately 70 to 80 hours per week in 2004 and 2005. 2:192.

Clendenen acknowledged that many artists, and Walser in particular, could probably not afford to do an audit of their royalty statements, or the audit would be financially burdensome; in all the time he worked for Antone's there was only one audit. 1:123-127.

Clendenen does not have copies of any corporate minutes beside the initial organizational minutes for the Debtors. 2:150. The initial organizational minutes were produced to Plaintiffs by email, but they do not appear to be part of the evidentiary record of any exhibit. 2:149. The initial minutes are "unsigned," according to the Plaintiffs' lawyer whose statement was not contradicted by the witness. 2:149. Clendenen also does not have any record of annual shareholder meetings minutes. He claims that Debtors may have taken minutes, but not in the past five years, and not since 2005 -- the year in which this lawsuit was filed. 2:151.

On July 8, 2005, the Texas Secretary of State issued statements of the forfeitures of the corporate charters of Defendants Texas Clef Entertainment Group, Inc. (2:147-48), Antone's Records (2:147-48), Texas Music Group, Inc. (2:147-48), and Bamba Incorporated, the entity under which Defendant Antone's Records, Inc. filed all of its federal income tax returns through

2007.  Plaintiffs' Pre-Trial Order, P. 12.  These entities forfeited their status because they were late paying their franchise tax.  2:149.  On July 7, 2006, the Texas Secretary of State issued statements of forfeiture of the corporate charters for Defendants Antone's Records, Inc., and Texas Music Group, Inc.  Plaintiffs' Pre-Trial Order, P. 13.

### ANALYSIS

Plaintiffs seek recovery under several alternative theories.  These theories include: (1) rescission of recording masters for the albums *Rolling Stone from Texas* and *Texas Top Hand,* (2) breach of contract, claiming that Debtors breached the recording contracts and Plaintiffs are entitled to damages because Debtors did not cure the default after being notified they were within the period allowed for cure, (3) breach of fiduciary duty, claiming that the Debtors' record label was in a fiduciary position with respect to Don Walser, and Defendants breached the fiduciary duty they owed to Walser, and finally, Plaintiffs claim that (4) the corporate veil should be pierced with respect to Defendants Heldt, Geissler, and Clendenen. Plaintiffs additionally request to be paid their attorney fees.

Plaintiffs also raise several issues regarding whether Walser's recording agreement with Debtors was executory.  *See* 11 U.S.C. § 365.  These issues relate to claims regarding Debtors' predecessors in interest, Watermelon Records, and a previous bankruptcy that Watermelon Records filed on December 31, 1998.  Plaintiffs' Post-Trial Brief, p. 15; D Ex. 22, p. 1. Watermelon's Joint Plan of Reorganization was confirmed on April 23, 2001.  Plaintiffs' Post-Trial Brief, p. 3; Plaintiffs' Pre-Trial Order, p. 6; D Ex. 22, p. 37; Defendants' Pre-Trial Order, p. 3.  Pursuant to the Plan, Watermelon's rights to Walser's recordings were transferred to Texas Clef.  These recordings were to be transferred free and clear of all liens and encumbrances. P Ex. 21, p. 6.  Watermelon listed the Walser album recordings *Rolling Stone from Texas* and

*Texas Top Hand* in an exhibit to the Plan. Defendants' Pre-Trial Order, p. 4. Plaintiffs' state court lawsuit against Debtors seeks rescission of the contract in regard to those albums' master recordings. 2:196; Plaintiffs' Pre-Trial Order, p. 11.

Executory Contract (Watermelon Records-Related Claims)

Plaintiffs argue that the August 15, 1994 Recording Agreement between Watermelon and Don Walser was an executory contract as of the petition date in the Watermelon bankruptcy case. The Watermelon Plan, confirmed on April 23, 2001 (P Ex. 22), provided that "Texas Clef proposes to purchase those executory contracts with artists that are identified on Exhibit 'A'". P Ex. 21, p. 6. Furthermore, the Plan provided that "those executory contracts associated with any of the entities or individuals identified on Exhibit "A" attached hereto and any contracts identified on Exhibit "A" are assumed by the Debtor and assigned to Texas Clef. . . ." P Ex. 21, p. 8. Exhibit "A" lists Walser as the artist associated with *Rolling Stone from Texas* (cat. no. 1028) and *Texas Top Hand* (cat. no. 1048). P Ex. 21, A-i-A-ii.

Plaintiffs further argue that if the contract is executory, then Walser's failure to file a proof of claim in the Watermelon case does not preclude him from making a claim under the Recording Agreement for anything that arose before or during the Watermelon case. *See* Plaintiffs' Post-Trial Brief, p. 6-7. Plaintiffs claim that "[i]f an executory contract is neither assumed nor rejected, it will 'ride through' the proceedings and be binding on the debtor even after a discharge is granted, thus allowing the non-debtor's claim to survive the bankruptcy." Plaintiffs' Post-Trial Brief, p. 7 (referencing ***Century Indemnity Co. v. Nat'l Gypsum Co. Settlement Trust (In re National Gypsum Co.)***, 208 F.3d 498, 504 (5th Cir. 2000) (citing ***Federal's Inc. v. Edmonton Inv. Co.,*** 555 F.2d 577, 579 (6th Cir. 1977)).

If an executory contract "rides through," then the non-debtor party to the agreement is not released from its duties and the non-debtor party must continue to perform; likewise, the debtor

must continue to perform or pay for services or other costs that are not discharged.  *See National*

*Gypsum* at 505.

> Section 365 [of the Bankruptcy Code] "allows a debtor to 'continue in a beneficial contract provided, however, that the other party is made whole at the time of the debtor's assumption of said contract.'"  *In re Eagle Bus Mfg., Inc.*, 148 B.R. 481, 483 (Bankr. S.D. Tex. 1992), 148 B.R. at 483 (quoting *In re J.W. Mays, Inc.*, 30 B.R. 769, 772 (Bankr. S.D.N.Y. 1983)).  This cure requirement is set forth in § 365(b)(1): If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.  11 U.S.C. § 365.
>
> Thus, the debtor party must take full account of the cost to cure all existing defaults owed to the non-debtor party when assessing whether the contract is beneficial to the estate.

*See Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.)*, 167 F.3d 843, 849 (4th

Cir. 1999); *MMR Holding Corp. v. C&C Consultants, Inc. (In re MMR Holding Corp.)*, 203

B.R. 605, 613 (Bankr. M.D. La. 1996) ("Assumption presumes curing all prepetition default").

*National Gypsum* at 506.

Plaintiffs' argument fails to the extent it argues that under 11 U.S.C. § 1141(d)(3),

Watermelon may not have received a discharge of its non-executory pre-petition debts despite

the plan's language to the contrary.  11 U.S.C. § 1141(d)(3) requires that;

> (3)  The confirmation of a plan does not discharge a debtor if—
>
> (A)  the plan provides for the liquidation of all or substantially all of the property of the estate;
>
> (B)  the debtor does not engage in business after the consummation of the plan; and
>
> (C)  the debtor would be denied a discharge under Section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).  Plaintiffs' argument fails because Walser's contract with Watermelon was no longer executory because he had performed all obligations under the Recording Agreement.  As part of the reorganization "individuals who are artists who have filed Proofs of Claim with the Bankruptcy Court are not treated as unsecured creditors in the Plan, because the claims that they hold, if any, are based upon executory contracts.  The Plan proposes that Texas Clef will assume those executory contracts, and Texas Clef must cure any default in those contracts to be able to assume them pursuant to §365 of the Bankruptcy Code."  P Ex. 21, p. 3.

Walser cannot pursue a breach of the Watermelon Plan for two reasons.  First, he did not file a Proof of Claim with the Bankruptcy Court during the Watermelon Plan, and, as such, he is treated as an unsecured creditor.  *See* P Ex. 21, p. 3.  The evidence at trial was that Walser elected not to file a proof of claim.  As such, under the Plan, Walser's unsecured claim would only be paid if any sale proceeds remained to pay unsecured claims.  Second, although Walser's Watermelon claims "ride through" the bankruptcy case, no evidence before the Court indicates that Walser was owed royalties by Watermelon at the time of the Watermelon bankruptcy.  *See* Plaintiffs' Post-Trial Brief, p. 9 (Walser did not file a proof of claim in that bankruptcy)**;** P Ex. 12, p. 53 (demonstrating that as of the "Period Ending December 31, 1997," Walser owed $107.36 on *Rolling Stone from Texas*); P Ex. 17 (demonstrating that as of the "Period Ending December 31, 1997," Walser had an unrecouped balance of $14,706.08 on *Texas Top Hand,* which means Watermelon did not owe Walser any money at the time of its bankruptcy case).  Further, inasmuch as the Recording Agreement allowed royalties to be cross-collateralized (D Ex. 2, ¶¶ 4.1 and 6.5), no net amount was due Walser.[9]

---

[9] In addition, the Supreme Court in *Travelers Indem. Co. v. Bailey*, 129 S.Ct. 2195 (2009) held that bankruptcy court orders are entitled to *res judicata* effect and are not subject to collateral attack.  Simply put, the Amended Plan and Order Confirming Plan provided for the sale of the Walser masters to Texas Clef.  The Order Confirming Plan is final.

Under the Recording Agreement, royalty statements are "conclusive, final, and binding upon you . . . unless specific objection is made in writing, stating the basis thereof, and delivered to Company within two (2) years after the date of such statement of account." P Ex. 4, p. 13. A specific objection was not made to most royalty claims from the Watermelon period, and most are barred due to statute of limitations, save for claims based on recoupable costs of $14,380, tour support/video costs of $332.92, tour support/video costs of $2,008.79, and tour support of $130. *See* Debtors' Trial Brief, p. 13. The claim based on recoupable costs is barred based on paragraph 6.5 of the Recording Agreement, which states that "[a]ny payments to Artist in connection with Artist's recording services . . . shall be fully recoupable from any royalties or other compensation earned by Artist under this agreement." P Ex. 4, p. 10. Further, as this Court explained in its oral ruling on the Debtor's objection to the proof of claim of Tish Hinojosa, a four year period of statute of limitations applies to a claim of breach of contract. *See Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002).

Plaintiffs' reliance on paragraph 4.1 of the Recording Agreement's listing of a specific dollar amount that Company "shall pay" for recording costs of Masters is misguided. The Company merely commits to pay a maximum "not to exceed $13,000" per LP album; no mention is made of what happens if the Company spends more to produce an album. P Ex. 4, p. 3.[10] The other Watermelon-related claims (a total of $2,471.71) do not exceed the combined $14,813.44 that was unrecouped to Watermelon. Even if the amount of $2,471.71 is added to the unrecouped cost, that amount does not affect this case's damages because it still leaves Watermelon's successors in interest unrecouped. Additionally, even if interest accrued, interest

---

[10] Similarly, the purported "Grant of Rights," ¶ 7, "Warranties, Representations, Distributions and Indemnities," ¶ 8, and "Controlled Compositions," ¶ 12, do not create any additional rights to be exercised by Plaintiffs.

stops accruing at the Watermelon bankruptcy petition date, which would still leave Watermelon unrecouped.  11 U.S.C. § 502(b)(2).[11]

Walser is prohibited from filing causes of action that relate to the Watermelon bankruptcy, but he is not barred from filing a claim for breach of contract based upon his 1994 recording agreement.  *See* P Ex. 4.  Claims for breach of contract are dealt with below in the section on "Breach of Contract."

Rejection of an Executory Contract (Watermelon Records-Related Claims)

Texas Clef properly assumed the executory contracts for Walser's two albums from the Watermelon Plan, but Plaintiffs argue that Texas Clef did not successfully fulfill the executory agreement.  Even if Texas Clef did not successfully fulfill the executory agreement, rejection of an executory contract constitutes a breach, 11 U.S.C. § 365(g), but it does not terminate the contract.  *See **In re Austin Dev. Co.,*** 19 F.3d 1077, 1082 (5th Cir. 1994); *see also **In re Continental Airlines,*** 981 F.2d 1450, 1459 (5th Cir. 1993) ("to assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached").

Rejection is treated as a breach, which can be quantified as a claim for damages from Watermelon Records and which excuses the debtor from performance.  *See **Continental Airlines*** at 1459; *see also **In re Lavigne***, 114 F.3d 379, 386-87 (2nd Cir. 1997).  Rejection of the executory contract would not affect the Watermelon Plan's sale free and clear of liens on the albums' master recordings.  *See* Debtors' Trial Brief, p. 17.  Plaintiffs argue that the text of Walser's contract means that rejection of the executory contract requires the return of master recordings, stating that their situation is different from the situation in ***Thompkins v. Lil' Joe Records, Inc.,*** 476 F.3d 1294 (11th Cir. 2007), where the Eleventh Circuit found that rejection of

---

[11] It should be noted that Debtors did not apply the unrecouped balance against post-Watermelon royalties.

an executory contract did not terminate the purchaser's interest in masters or copyrights. Plaintiffs' argument that Walser's contract is significantly different from the ***Thompkins*** contract fails because the recording contract provision 7.1, the "Grant of Rights," states that "[a]ll Master Recordings . . . shall be the sole property of Company, free from any claims."  P Ex. 4, p. 10. Provision 7.1's notable exception is that Walser and his successors may make claims on the "payment of royalties as provided herein."  P Ex. 4, p. 10.

There is no language that the lack of payment of royalties requires Debtors to surrender the masters.  Furthermore, Watermelon did not owe Walser any money on the albums at the time of the bankruptcy, so no claims survive from that period.  Nothing in the Recording Agreement requires the Defendants to turn over the masters due to a breach of contract.  Further, as discussed herein, the Copyright Act itself does not impose such a requirement.

Fraud Claims

Plaintiffs argue that the recording agreement may be "marred by fraud."  Plaintiffs' Pre-Trial Order, p. 17.  No evidence exists that demonstrates actual fraud.  Although Debtors and third parties may have made indications to Walser that his royalties would be paid, even if Walser's royalties were not properly satisfied, the Plaintiffs need to prove that Debtors had no intention of performing their promises.  *See **Coffel v. Stryker Corp.**,* 284 F.3d 625, 633-34 (5th Cir. 2002); ***Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,*** 960 S.W.2d 41, 48 (Tex. 1998).  The Plaintiffs did not prove that Debtors lacked any intention to perform their promises; in fact, Debtors presented rationales for their royalty calculations and Debtors eventually corrected their calculations based on Barker's letter.  *See* D Ex. 30 (a royalty statement justifying each deduction); D Ex. 33 (correction of royalty statement, received three days after the period for cure expired).  The Debtors admit that they did not remit royalty

statements as required by the recording contract. That said, royalty statements were eventually sent to Walser and/or Barker with checks for payment.

Plaintiffs do not satisfy Federal Rule of Civil Procedure 9(b)'s requirement for specific allegations in pleading to establish fraud. Under Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). The Fifth Circuit requires a plaintiff to allege "the particulars of time, place, and contents of the false representations" (***Williams v. WMX Techs., Inc.,*** 112 F.3d 175, 179 (5th Cir. 1997)), as well as the identity of the person making the misrepresentation and what that person obtained thereby, otherwise referred to as the "who, what, when, where, and how" of the alleged fraud. *See **United States ex rel. Willard v. Humana Health Plan of Texas Inc.,*** 336 F.3d 375, 384 (5th Cir. Tex. 2003) (citing ***United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.***, 125 F.3d 899, 903 (5th Cir. 1997)). Plaintiffs mention that Geissler told Walser that his music be "taken care of" in the wake of the Watermelon bankruptcy. Furthermore, being "taken care of," to the extent that it may have been promised, included promises that Walser's records would be re-released and available. 1:221. Debtors reissued Walser's records in August 2001. Debtors and Geissler, even if they made assurances to Walser, appear to have fulfilled at least one understanding of what being "taken care of" could mean. The case for actual fraud has not been pled with the requisite specificity.

Constructive fraud would involve a breach of trust or breach of a confidential relationship. ***Monnig's Dep't Stores, Inc. v. Azad Oriental Rugs (In re Monnig's Dep't Stores, Inc.)***, 929 F.2d 197, 201 (5th Cir. 1991) (citing ***Archer v. Griffith,*** 390 S.W.2d 735, 740 (Tex. 1964)). Because there is no fiduciary relationship here, as is discussed below, constructive fraud

will not be found.  Constructive fraud is also not found in contract claims because "[i]n 1989, the Legislature amended Article 2.21 of the Business Corporation Act to eliminate constructive fraud and failure to observe corporate formalities as vehicles for establishing shareholder liability for corporate acts in connection with contract claims."  *Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103, 146 (Tex. App.—Texarkana 1994, no writ), *vacated pursuant to settlement* 1995 WL273592; *Love v. State*, 972 S.W. 2d 114, 118 (Tex. App.—Austin 1998, pet. denied).

Copyright Claims (Watermelon Records-Related Claims)

Plaintiffs argue that *Texas Top Hand*, the second album recorded by Walser for Watermelon, never transferred to Watermelon because Watermelon did not properly exercise its option for the album.  *See* Debtors' Trial Brief, p. 16-17.  Plaintiffs imply, and Debtors do not deny the possibility that, Walser voluntarily recorded the album because the option may not have been validly exercised.  Plaintiffs' Post-Trial Brief, p. 11; P Ex. 10 (a 1997 letter describing how Barker believes that *Texas Top Hand* was not recorded pursuant to the recording agreement).

Debtors respond that "any suit to recover [*Texas Top Hand*] would have been barred by limitations in 2000."  Debtors' Trial Brief, p. 16.  Civil claims, like this one, under the Copyright Act are barred under a three year statute of limitations.  17 U.S.C. § 507.  In this Circuit a copyright claim accrues "when [the party] knew or had reason to know of the injury upon which the claim is based."  *Pritchett v. Pound*, 473 F.3d 217, 220 (5th Cir. 2006); *see also* *Groden v. Allen*, 279 Fed. App'x 290, 294 (5th Cir. 2008) (per curiam).  Under the Copyright Act, "[r]ecordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document."  17 U.S.C. § 205(c); *Daboub v. Gibbons*, 42 F.3d 285, 291 (5th Cir. 1995).  The recorded document must contain information that would put the party on notice."  *Jordan v. Sony BMG Music Entm't Inc.,* 354 Fed. App'x 942, 945 (5th Cir. 2009).  Barker's 1997 letter to Defendants indicates that Walser knew of the alleged injury, but Walser

took no action within the permitted time period.  Because of the statute of limitations and the transfer of *Texas Top Hand* through the Watermelon Plan, the Court does not need to reach Plaintiffs' arguments that there was no writing in place to transfer copyright in the recording. *See* Plaintiffs' Post-Trial Brief, p. 10-11 (elucidating Plaintiffs' arguments).

The Court holds that the Walser contract was an executory contract that Texas Clef assumed after the Watermelon bankruptcy, so the Court does not need to address Plaintiffs' arguments in response to Debtor's claims that the contract was non-executory.  The contract was listed and assumed as executory under the bankruptcy plan purchase of Watermelon's assets by Texas Clef.  P Ex. 21, Ex. A.

Breach of Contract

A breach of contract action must meet several elements for it to be successfully brought. First, there needs to be a valid, enforceable contract.  Second, the plaintiff must have performed, tendered performance of, or was excused from performing his contractual obligations.  Third, the Defendant must breach the contract.  Fourth, the Defendants' breach must cause the Plaintiff injury.  *See **Smith Int'l, Inc. v. Egle Group, LLC**,* 490 F.3d 380, 387 (5th Cir. 2007) (listing the second element); ***Mullins v. TestAmerica, Inc.,*** 564 F.3d 386, 418 (5th Cir. 2009).  Additionally, the plaintiff must be a proper party to sue for the breach of the contract.  ***Zuniga v. Wooster Ladder Co.,*** 119 S.W.3d 856, 862 (Tex. App.—San Antonio 2003, no pet.) (citing ***Copeland v. Alsobrook***, 3 S.W.3d 598, 608 (Tex. App.—San Antonio 1999, pet. denied) for the proposition that a party to a contract has standing to enforce the contract on behalf of a third-party beneficiary).

Element (1)

The Walser contract is a valid and enforceable contract because the contract itself is not challenged as being invalid or unenforceable.

Element (2)

The case includes some dispute as to whether Walser successfully performed, tendered performance of, or was excused from performing contractual obligations; however, this Court is convinced that Walser successfully performed his necessary contractual obligations.  Some of the record indicates Walser may have non-performed several aspects of his contract, but those issues were not raised in Debtors' briefs.  *See* P Ex. 9 (describing how Walser "failed to commence recording the contracted album on that date . . . [and he is] in breach of the agreement."  Correspondence from Craig Barker to Sawnie Aldredge (dated March 20, 1997) rebuts that argument by stating that Watermelon did not "timely and properly exercise[] it's [sic] option."  P Ex. 10, p. 1.  Furthermore, Debtors did not cross-claim for Plaintiffs' non-performance.  Because Debtors did not make Walser's alleged contract non-performance an issue in this case, the Court finds that Element 2 is fulfilled.  *See* Defendants' Pre-Trial Brief, p. 10-11 (not discussing Plaintiffs' alleged non-performance of the contract as a disputed factual issue).

Element (3)

The Defendants breached the contract by failing to cure during the thirty-day period provided for cure.  *See* Debtors' Post-Trial Brief, p. 3; Defendants' Exhibit 27, pp. 4-5; *see also* 2:90, 195.  A defendant may breach a contract by neglecting or refusing to perform a contractual obligation.  **Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,** 925 S.W.2d 565, 572 (Tex. 1996).  The contract provided Defendants a period to cure after they were notified of the beginning of a thirty-day period to cure contractual obligations.  D Ex. 2, p. 16, para 13.4 (explaining how "no breach of the agreement on the part of Company or you shall be deemed material, unless the party shall have given the other paty [sic] notice of such breach and such

party shall fail to . . . otherwise cure such breach within thirty (30) days after receipt of such notice if such breach is reasonably capable of being fully cured within such thirty (30) day period; or, if such breach is not reasonably capable of being fully cured within such thirty (30) day period, if the party commences to cure such breach within such thirty (30) day period, and proceeds with reasonable diligence to complete the curing of such breach and cure such breach in a reasonable time"). The notice of default and period to cure began on May 5, 2004. Plaintiffs' Pre-Trial Order, p. 9; 2:86; P Ex. 39.

On June 7, 2004, Barker sent a letter that disputed what the Debtors owed Walser, claiming that Walser was owed $12,412.48. 2:90; Plaintiffs' Pre-Trial Order, p. 10; P Ex. 41. The thirty-day cure period expired on June 5, 2004, without Debtors curing their default. 2:87, 195; Plaintiffs' Pre-Trial Order, p. 10. TMG amended its royalty statement and sent it to Walser (dated June 6), reflecting a balance owed of $10,830.61. Plaintiffs' Pre-Trial Order, p. 10; D Ex. 33. TMG finally tendered payment and another amended royalty statement on June 12, 2004, eight days after the cure deadline expired. Debtors' Post-Trial Brief, p. 3; Plaintiffs' Exhibit 52; *see also* 2:195. Although TMG tendered amended royalty statements, TMG did not cure its breach within the thirty day period by paying any due amounts. No money was transferred to Walser until eight days after the cure deadline expired. *Id.* As such, Debtors breached their contract with Walser.

Element (4)

The Defendants' breach caused the Plaintiffs' financial injury. Financial injury establishes injury for purposes of fulfilling the element. *See **Prudential Sec., Inc. v. Haugland***, 973 S.W.2d 394, 397 (Tex. App.—El Paso 1998, pet. denied). Evidence must show that the damages are the natural, probable, and foreseeable consequence of the Defendants' conduct.

*Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981); *Winograd v. Clear Lake City Water Authority*, 811 S.W.2d 147, 156 (Tex.App.—Houston [1st Dist] 1991, writ denied). Considering that Walser had "mounting medical expenses" (2:233), and he was generally known to be in such poor health that a benefit concert was conducted to raise money for his medical fees (1:233), Plaintiffs successfully prove that the alleged injury was a natural, probable, and foreseeable outcome of the breach of contract, and the injury caused actual monetary damages to the plaintiff. *See Haugland* at 397. Further, Defendants do not contest that Walser suffered some economic injury; the question is how much.

<u>Conclusion and Damages</u>

The Defendants breached the contract, and the Defendants failed to properly cure during the period provided for cure. Therefore, contract damages should be awarded to Plaintiffs. Contract damages are in the amount of $28,161.41, plus pre-judgment interest in the amount of $1,025.15. Debtors' Post-Trial Brief, p. 2, 10.

The Tenth Circuit found that prejudgment interest may be awarded under the Copyright Act, even though the act does not provide for prejudgment interest. *Kleier Advertising, Inc. v. Premier Pontiac, Inc.,* 921 F.2d 1036, 1041-41 (10th Cir. 1990). Therefore, the Court finds that Plaintiffs are entitled to interest as provided for in 28 U.S.C. § 1961, which states that "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."

Debtor's theory for calculation of interest is that "under Texas law, a creditor is entitled to 5% interest. TEX. FIN. CODE § 304.003(c). Pre-judgment interest begins to accrue thirty (30) days after demand is made. In this case, demand was made on May 5, 2004, so that interest began to accrue on June 3, 2004." After that point, "Plaintiffs refused to accept Debtors' tender

of royalties owed.  As a result, Plaintiffs are not entitled to recover interest" on those amounts. Debtors' Trial Brief, p. 25-26.

<u>Rescission</u>

Rescission is available when there is no other adequate remedy at law.  ***Ferguson v. DRG/Colony North, Ltd.,*** 764 S.W.2d 874, 886 (Tex. App.—Austin 1989, writ denied).  A plaintiff must show that a defendant materially breached the contract or the contract was fraudulent or it was made by mistake.  ***Atkins v. Beasley***, 544 S.W.2d 505, 507 (Tex. Civ. App.—Waco 1976, no writ).  To preserve a cause of rescission, a plaintiff needs to refuse the benefits of the contract after discovering the grounds for rescission.  ***David McDavid Pontiac, Inc. v. Nix***, 681 S.W.2d 831, 835-36 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).  Furthermore, a court may grant rescission if the contract being rescinded was the result of a breach in fiduciary duty owed to the plaintiff by the defendant.  ***Miller v. Miller***, 700 S.W.2d 941, 949 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).  Some cases permit both damages and rescission be awarded to the plaintiff, based on equitable concerns.  ***Atkins*** at 507.

Plaintiffs have other adequate remedies at law regarding the breach of contract.  Plaintiffs filed a proof of claim in Debtors' bankruptcy proceeding and, as discussed above, this Court awards damages to Plaintiffs based on breach of contract with Debtors.  This Court does not need to reach the other elements that comprise a claim of rescission because Plaintiffs fail to fulfill the initial element; however, as demonstrated below, there was no fiduciary duty that could be breached.  Additionally, Plaintiffs may not have fully refused the benefits of the contract after discovering grounds for rescission; Plaintiffs accepted checks that were issued after the cure deadline expired.  D Ex. 27, p. 031925, 031926.  One check was for $5,250 on June 18, 2004 and the other was for $5,250, issued on June 22, 2004.  Debtors' Post-Trial Brief, p. 3; Defendants' Exhibit 27, pp. 4-5; *see also* 2:90, 195.

Central to Plaintiffs' case is the proposition that the Recording Agreement can be rescinded and that a constructive trust can be imposed upon the masters and/or the profits earned by the Debtors from the masters. Plaintiffs' rescission claims are barred by both Federal Copyright law and Texas state law. The constructive trust remedy is similarly unavailable.

What the parties have referred to as the masters is actually the right to the intellectual property associated with the performance of the songs. When an artist writes a song, the artist owns the copyright to that song. 17 U.S.C. § 201(a). A copyright gives the owner four exclusive rights, including the rights to reproduce by copy or phonorecord, the right to prepare derivative works, the right to distribute copies or phonorecords to the public, and to perform or display the work publicly. 17 U.S.C. § 106. Each of these rights may be separately conveyed by the author. *Herwig v. United States*, 122 Ct. Cl. 493, 105 F. Supp. 384 (Ct. Cl. 1952). However, when that song is recorded, there is a separate copyright in the performance of the song. *Jordan v. Sony BMG Music Entm't, Inc.*, 637 F. Supp. 2d 442 (S.D. Tex. 2008) ("Under the Copyright Act, sound recordings (in this case, the fixation of the combined music and lyrics) and the underlying musical compositions are separate works with distinct copyrights"). When an artist enters into a contract with a record label, the performance generally does not exist. The record label pays for the cost of creating the performance, including an advance to the artist, payment of the musicians who perform the song and payment of the costs of creating the master recording. In return, the artist agrees that the copyright to the performance (as opposed to the words and music themselves) belongs to the record label. The master is the embodiment of the performance on tape or digital image which can be used to produce compact discs or digital downloads for sale to the public. Because the record label pays for the creation of the master, record contracts provide that the master belongs to the label. More importantly, the copyright for the performance

belongs to the label as well. The contracts between Don Walser and the record labels followed the normal practice in the industry.

The rescission claim is preempted by the Federal Copyright Act. **Santa-Rosa v. Combo Records**, 471 F.3d 224 (1st Cir. 2006). In **Santa-Rosa**, the Court of Appeals stated:

> Because Santa Rosa seeks rescission of his contract, if we were to grant him the relief he sought, we would be required to determine his ownership rights by reference to the Copyright Act. In such a case, there is little question that we would be merely determining whether Santa Rosa was entitled to compensation because of "mere copying" or "performance, distribution or display" of his recordings (citation omitted). As such, 17 U.S.C. § 301(a) preempts Santa Rosa's rescission claim.

**Santa-Rosa** at 227.

Even if rescission were not preempted by the Federal Copyright Act, the remedy would not be available under Texas law.

> Judicial rescission is an equitable remedy that seeks to set aside an otherwise legal contract due to fraud, mistake, or for some other reason when it is necessary to avoid unjust enrichment of the non-complaining party to the contract, so that the parties thereto may be restored, insofar as is possible, to the status or position they were in prior to execution of the contract (citation omitted). As between the parties, a contract subject to rescission is not void, but is voidable. After performance of the contract, the transaction remains voidable, and rescission remains a viable option, so long as the status quo of the parties prior to entry of the contract can be restored. Until the transaction has been rescinded, the parties remain in the position they were in after performance of the contract but prior to the rescission, i.e., in the context of an executed real estate sales contract, the grantee has the right to possession of the property and the grantor has no interest in the property (citation omitted).
>
> Rescission is a harsh remedy generally not favored by the courts, and it will not be granted where other relief is available unless the relative equities, when weighed by the court, clearly favor the party seeking rescission (citation omitted). When contemplating the remedy of rescission, the trial court must weigh several factors to determine whether a party's request for rescission should be granted, including, but certainly not limited to: (1) probability of irreparable damage to the requesting party in the absence of relief; (2) possibility of harm to the non-complaining party if the requested relief is granted; (3) the status quo of the parties, i.e., whether they are presently in or can be placed in the status or position they were in prior to execution of the contract; (4) whether any retained benefits can be restored to the other party; (5) whether rescission will in fact restore the

parties to their former position; (6) whether the party seeking rescission has "clean hands"; (7) whether the complaining party has another adequate remedy at law; and (8) the public interest (citation omitted).

To be entitled to rescission, a party must plead and prove the absence of an adequate remedy at law. Furthermore, the party requesting rescission must show that either there are no retained benefits received under the contract which are not being restored to the other party, or that there are equitable considerations that obviate the need for restoration of the status quo (citation omitted). An inability to return the parties to their pre-contract positions is only one factor that should be considered in determining whether rescission would be equitable (citation omitted). Likewise, the "clean hands" of the party seeking rescission is only a factor for the trial court to consider (citation omitted).

*Holt v. Robertson*, 2008 Tex. App. LEXIS 3735 (Tex. App.—Amarillo, 2008, no pet.).

Rescission is not available for several reasons. To begin with, Walser failed to file a proof of claim in the Watermelon case nor was he owed money. Debtors did, although belatedly, pay Walser for royalties after the breach occurred. Second, the parties to the contract (Walser and Watermelon) cannot be restored to their original positions. Furthermore, this is primarily a dispute about payment of money. Monetary disputes are the paradigm of a dispute for which there is an adequate legal remedy.

Breach of Fiduciary Duty

A breach of fiduciary duty may only occur if a fiduciary relationship existed. A fiduciary relationship may be based on formal or informal relations in which one person places a special confidence in another who, in equity and good conscience, is bound to act in good faith and with due regard for the interest of the person placing the confidence. *See Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980); *Lacy v. Ticor Title Ins. Co.*, 794 S.W.2d 781, 788 (Tex. App.—Dallas 1990), writ denied, 803 S.W.2d 265 (Tex. 1991). Plaintiffs argue that fiduciary duties can be extended to corporate officers, but those circumstances are limited to circumstances when a corporate officer diverts a corporate opportunity to himself, or if the transaction is made while the corporation is insolvent. *See Dyer v. Shafer*, 779 S.W.2d 474, 477

(Tex. App.—El Paso 1989). The burden of establishing the existence of a fiduciary relationship rests with Plaintiffs. *See* ***Priddy v. Rawson***, 282 S.W.3d 588, 599-600 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

 A.  Formal Fiduciary Relationship

  In a formal fiduciary relationship, a court extends protection the moment an agreement is entered into, solely on the basis of the relationship, but this case does not establish a formal fiduciary relationship. ***Insurance Co. of North America v. Morris***, 981 S.W.2d 667, 674 (Tex. 1998). Plaintiffs are unable to cite any cases where Texas courts specifically recognize a relationship between a recording artist and a record label as constituting a formal fiduciary bond. *See* Defendant's Trial Brief, p. 14. Texas courts, in oil and gas royalties, specifically refuse to recognize the royalty relationship as being fiduciary in nature. *See* ***HECI Exploration Co. v. Neel***, 982 S.W.2d 881, 888 (Tex. 1998); ***Vial v. Gas Solutions, Ltd.,*** 187 S.W.3d 220, 230 (Tex. App.—Texarkana 2006, pet. denied).

  Plaintiffs attempt to prove that the law of agency establishes a fiduciary duty between Debtors and Walser. Agency is "a fiduciary relationship by which a party confides to another the management of some business to be transacted in the former's name or on his or her account, and by which such assumes to do the business and render an account of it." 3 AM. JUR. 2D *Agency* § 1 (2002). Under Texas law, agents owe a fiduciary duty to their principals. ***National Plan Adm'rs, Inc. v. National Health Ins. Co.,*** 235 S.W.3d 695, 700 (Tex. 2007). No Texas court has found an agency relationship between recording artists and record companies. It does not appear that Walser sought or relied upon Debtors' management of his business; Debtors sold records he produced. Walser signed over the records' masters in return for royalties. Debtors owned the records, and Walser was entitled to a portion of the profits. Moreover, Nancy

Fly acted as Walser's agent and the evidence provided through Bensimon Seifert and Walser's children does not establish a special relationship between Walser and the Debtors.

The testimony of Nancy Fly Guenther is instructive on the issue of whether there could be a formal fiduciary relationship. Fly started out as Walser's booking agent in 1996 and became his manager in 1997. Fly retained Barker to deal with issues regarding the royalty statements because she thought the royalty statements were not accurate, timely, and difficult to discern. She urged Walser to file a proof of claim in the Watermelon case but Walser refused to do so.

In addition, Fly stated that she did not know if there was ever any formal objection to the royalty statements until Barker was retained. Further, Fly acknowledged that Walser declined to join suit with other artists who were suing the label for unpaid royalties. In sum, Fly's testimony demonstrates that Walser disregarded her advice and there is no proof that Walser relied on Debtors for advice.

Plaintiffs also attempt to establish a formal fiduciary duty by citing Texas mineral-rights ownership case law. Plaintiffs' argument, while creative, does not convince this Court that the mineral-rights cases' implied fiduciary duties should extend to this case. As previously stated, Texas courts, in oil and gas royalties, specifically refuse to recognize the royalty relationship as being fiduciary in nature. *See HECI*, 982 S.W.2d at 888; *Vial,* 187 S.W.3d at 230. *Manges*, 673 S.W.2d at 182, which Plaintiffs cite for the proposition that a fiduciary duty is breached by the holders of executive rights to a mineral estate when they did not "acquire for the non-executive every benefit that he exacts for himself," narrowly applies when the executive rights holder is selling the property or some interest in the property. *Id.* That provision is designed to prevent unjust enrichment by the holders at the expense of the non-

executive holders -- a situation that is not analogous to this case because unlike the situation where executive and non-executive holders of interest in mineral rights may have conflicting interests; the interest of Walser and the interest of Debtors are aligned -- both gain money when Walser sells more records.

Plaintiffs additionally attempt to argue that in oil and gas law, an executive interest holder owes at least a higher duty of "utmost good faith," and that duty may be elevated to a fiduciary duty if Plaintiff shows it became a relationship involving confidence and trust. *See* ***Pickens v. Hope***, 764 S.W.2d 256, 268 (Tex. App.—San Antonio 1988, writ denied). The circumstances here did not rise to the level of involving confidence and trust, so the ***Pickens*** argument does not establish that Debtors owed Walser a fiduciary duty.

B.    Informal Fiduciary Relationship

An informal fiduciary relationship may be created where a "special confidence" is placed in one person who "is bound to act in good faith and with due regard to the interests of the one reposing confidence." ***Texas Bank***, 595 S.W.2d at 507. Whether there is an informal fiduciary relationship is a question of fact based on the circumstances surrounding a "moral, social, domestic, or purely personal relationship." ***Thigpen v. Locke***, 363 S.W.2d 247, 253 (Tex. 1962). Plaintiff cites ***Apple Records*** to support the assertion that there could be an informal fiduciary relationship between a recording artist and record company, based on their business dealings. *See* ***Apple Records, Inc. v. Capitol Records***, 137 A.D.2d 50, 57 (N.Y. App. Div. 1988).

Walser and Defendants' business relationship was effected through signing of the Recording Agreement and Walser's discussions with Geissler. Walser appeared to have some degree of trust in Defendants, but there is not sufficient evidence that Walser and Defendants

spent a great deal of time together or is there evidence that the two "developed a close personal relationship of trust and confidence that could give rise to a fiduciary relationship" before entering into their recording agreement. *See **Willis v. Donnelly***, 199 S.W.3d 262, 277 (Tex. 2006). Additionally, "[a]rms length transactions entered into for the parties' mutual benefit . . . do not establish a basis for a fiduciary relationship." ***Schlumberger Tech. Corp. v. Swanson,*** 959 S.W.2d 171, 177 (Tex. 1997); *see also **Meyer v. Cathey**, 167 S.W.3d 327, 331 (Tex. 2005).

After entering into the agreement, it is unclear that Walser put trust in Defendants. Walser, who is deceased, cannot testify to whether he trusted Defendants; however, the course of actions between Walser and Defendants as recounted by several witnesses does not indicate that a reasonable person would have trusted them, or that Walser effectively trusted them. Walser's children describe him as a trusting person and claim he trusted Geissler (2:235); however, their testimony is controverted. Additionally, one of Geissler's employees, Mark Rubin, testified that Rubin warned Walser not to put his trust in Debtors. 1:203. Additionally, Geissler treated Walser poorly, in December 1996, "[o]n the day prior to the scheduled [recording] sessions, Heinz Geissler . . . acting without notice of any kind, indefinitely canceled the recording sessions. This caused Don, the musicians and the studio to suffer serious financial loss." P Ex. 10, p. 44. Despite the warning, the cancellation, and the alleged untimely reporting of royalty statements and underpayment of royalties before the Watermelon bankruptcy, Walser did not file a proof of claim, which could imply that he trusted Debtors, or it could imply that he did not feel it was worth the time or expense to challenge the case. In fact, after discussing whether to file a proof of claim with his manager, Nancy Fly Guenther, Walser elected not to do so. Without more evidence before the Court, this Court will not presume that Don Walser held Debtors in a position of trust elevated enough to rise to the point of establishing in them a fiduciary duty.

This analysis applies to the issue of whether Heinz Geissler had a fiduciary (formal or informal) relationship with Don Walser.  As an initial matter, it is uncontroverted that Geissler was not a party to the recording agreement after Texas Clef assumed and purchased the assets of Watermelon.  Further, there is no evidence of Walser having a fiduciary relationship with Geissler.  The evidence adduced at trial was that Walser distrusted Geissler and because of Geissler's business dealings with Walser's manager, T.J. McFarland, Walser himself elected not to do business with Geissler.  Finally, like Heldt and Clendenen, Geissler was not a shareholder, officer, or director of the Debtors.

*Apple Records* is not dispositive of the law or facts of this case and does not create any *Apple* duties.  This case and *Apple Records* possess some similarities.  *Apple Records* held there was an informal fiduciary relationship when the Beatles had a long relationship with the company, and the Beatles constituted 25-30% of the company's business.  *Apple Records* at 57.  Walser had a 10-year relationship with Debtors between his signing of the initial recording agreement and the time he filed his lawsuit.  Testimony also revealed that Walser's albums accounted for a significant part of their business.  One major difference is that unlike with the Beatles, Walser's contract almost immediately became contested.  In December 1996, only two years after the signing of the recording agreement, Watermelon caused Walser significant financial loss through its actions; additionally, Defendants' lawyer and Watermelon sent several contentious letters between February and March 1997, threatening legal action.  *See* P Ex. 7, 8, 9, 10.  Although Walser might have been a trusting person, the Court does not have his personal testimony on the issue and it appears that Watermelon and Debtors never treated him well enough in regards to providing the contract's required royalty statements, and a reasonable person may have been wise not to trust Debtor/Defendants.

Additionally, ***Apple Records*** has been distinguished on several grounds, because (1) plaintiffs may not have originally had representation when they signed their first contract, (2) plaintiffs were represented at the time of the second contract, and (3) an agency relationship could not be found between plaintiffs and defendants. ***Faulkner v. Arista Records LLC***, 602 F. Supp. 2d 470, 484 (S.D.N.Y. 2009). "Plaintiffs [the Beatles] were represented by an intermediary, pass-through corporate entity, ALK, in their second agreement with Defendant in 1975, to best 'protect [their] interests.' (Am. Compl. p. 46.) These differences prevent the Court from sustaining Plaintiffs' claim for breach of fiduciary duty against Defendants' motion to dismiss under Apple Records." Walser was guided by intermediaries like Walser's agent, Nancy Fly Guenther, who continually contacted Defendants, and lawyer Craig Barker, who represented Walser and who communicated with Watermelon and its successor Defendants. These distinctions lead this Court to conclude the relationship between Walser and Debtors was conducted at arm's length at least in late 1996, after Nancy Fly Guenther became Walser's booking agent (1:206), and after Walser retained Mr. Barker as his attorney. After that point, it is difficult to argue successfully that any fiduciary relationship of trust existed between Walser and Debtors despite Walser's failure to file a proof of claim in the Watermelon case.[12]

## Constructive Trust

Imposition of a constructive trust would remove assets from the estate at the expense of other creditors. A constructive trust is "an equitable remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act." ***Douglass v. Langehennig (In re Douglass),***

---

[12] The Plaintiffs' argument that there exists an unequal bargaining position between record label and artist, while true, is inapposite to the issue of rescission. Simply put, independent labels sometimes are the only means that an artist with either a local or regional following can publish music. There is no dispute that Walser and his heirs should have been compensated timely for Walser's musical talents. That said, compensation should be in the form of repayment of royalties with accrued interest. That is the benefit of the bargain of the Recording Agreement. Notwithstanding Senator Murray's comments to the contrary about the bad behavior of some record labels' dealings with its artists (as the case here), this matter is governed by contract law. *See* Plaintiffs' Post-Trial Brief, p. 26.

413 B.R. 573, 581 (Bankr. W.D. Tex. 2009) (quoting *In re Haber Oil Co., Inc.,* 12 F.3d 426, 436 (5th Cir. 1994)).   A constructive trust is permitted as a matter of law when the person holding the property would be unjustly enriched if he were able to keep the property. *Omohundro v. Matthews*, 341 S.W.2d 401, 404 (Tex. 1960).   A constructive trust may be imposed when there is a breach of fiduciary duty or actual fraud.   *Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974).   The requirements for imposing a constructive trust are: (1) a breach of a fiduciary or confidential relationship or, in the alternative actual fraud; (2) unjust enrichment of the wrongdoer; and (3) there is a traceable res upon which to impress the trust. *Monnig's Dep't Stores*, 929 F.2d at 201; *Douglass*, 413 B.R.at 581; *see also* Debtors' Trial Brief, p. 23-24.

There was no fiduciary relationship in this case, as demonstrated by the Court's discussion above.   Therefore, there could not be a breach of a fiduciary or confidential relationship.   Additionally, there was no actual fraud in this case, as previously discussed in "Fraud Claims" above.

The first element required to establish a constructive trust is not fulfilled by this case; therefore, the Court will not impose a constructive trust.   If there was a breach of a fiduciary relationship, then the Court would need to determine if the wrongdoer was unjustly enriched.   If the Debtors received funds to which they were not entitled, then the Court could find unjust enrichment.   Debtors however, argue there is no identifiable res on which to impose a trust.   On the date that the Debtors filed bankruptcy, they held funds in their bank accounts from their general operations.   It is impossible to trace these proceeds to amounts received from any particular master.

In the alternative, Plaintiffs have pled additional causes of action as grounds for recovery.

Piercing the Corporate Veil[13]

A corporate veil may be pierced under several theories; undercapitalization, sham to perpetuate a fraud, or alter ego.  Generally under Texas law, a corporation is a separate legal entity that insulates its owners from personal liability, and the mere fact that one is an officer, director, or majority shareholder is insufficient to support a finding of alter ego.  **Nichols v. Tseng Hsiang Lin**, 282 S.W.3d 743, 747 (Tex. App.—Dallas 2009, no pet.).  The burden of showing that the corporate entity should be disregarded rests with the party seeking to pierce the corporate veil.  *See* **Seidler v. Morgan**, 277 S.W.3d 549, 558 (Tex. App.—Texarkana 2009, pet. denied).

A.    Undercapitalization

The theory of undercapitalization permits the veil to be pierced if the corporation was undercapitalized to the point that it created an injustice.  The Plaintiffs have the burden of proof to show through evidence that the corporation did not have sufficient capital to operate its business and the corporation was essentially a "shell" of a company.  **Tigrett v. Pointer**, 580 S.W. 2d 375, 382 (Tex. App.—Dallas 2005, no pet.).  Inadequate capitalization alone, however, is not a sufficient basis for piercing the veil.  *See* **id.**; **Ramirez v. Hariri**, 165 S.W.3d 912, 917 (Tex. App.—Dallas 2005, no pet.); **Assoc. Dev. Corp. v. Air Control Products, Inc.**, 392 S.W.2d 542, 545 (Tex. Civ. App.—Austin 1965, writ ref'd n. r. e.).  Even if the company was undercapitalized, which this Court does not decide at this point, undercapitalization alone will not support an action for piercing the veil.[14]

---

[13] Defendants contend that any theory regarding piercing the corporate veil are property of the estate and only the Debtors should have standing to bring this claim.  *See* **In re S.I. Acquisition Inc.**, 817 F.2d 1142 (5th Cir. 1987).  Rather than reach a conclusion on this issue, the Court will address each issue as if the Plaintiffs have standing.

[14] As noted herein, the testimony of Plaintiffs' expert, Dr. Berry, is unavailing because it erroneously relies on several theories unsupported by both law and fact.

B.      Sham to Perpetuate a Fraud

The veil may also be pierced if an officer or a director uses the company as a sham to perpetuate a fraud.  *Willis*, 199 S.W.3d at 272.  In 1989, the Legislature amended Article 2.21 of the Business Corporation Act to eliminate constructive fraud and failure to observe corporate formalities as vehicles for establishing shareholder liability for corporate acts in connection with contract claims.  An exception is by showing actual or common-law fraud.  One court found a sole shareholder liable for company debts when he incorporated a new business to continue the business of a foreclosed company where the foreclosure sale was merely an attempt to avoid creditors.  *Rimade Ltd. v. Hubbard Enters., Inc.,* 388 F.3d 138, 145 (5th Cir. 2004) (describing *Klein v. Sporting Goods, Inc.,* 772 S.W.2d 173, 176-77 (Tex. App.—Houston [14th Dist.] 1989)).  The fraudulent behavior involved can be constructive fraud, rather than actual fraud, but only if the claim is not made on a contractual obligation.  *Crum & Forster*, 887 S.W.2d at 146; *Love v. State*, 972 S.W. 2d 114, 118 (Tex. App.—Austin 1998, pet. denied).  "In 1989, the Legislature amended Article 2.21 of the Business Corporation Act to eliminate constructive fraud and failure to observe corporate formalities as vehicles for establishing shareholder liability for corporate acts in connection with contract claims."  *Crum & Forster* at 146; *Love* at 118.  As previously discussed under "Fraud Claims" above, Plaintiffs have not proved that Debtors used their company as a sham to perpetuate a fraud either generally with respect to all recording artists, or even specifically with respect to payments owed to Walser.

C.      Alter Ego

The veil may furthermore be pierced when a corporation was formed and operated to serve as a tool or conduit of a person or another corporation as an "alter ego".  *Willis* at 272. For the alter ego doctrine to succeed, Plaintiffs must show that defendant James Heldt had a

financial interest, ownership, or control of both companies. *Stewart & Stevenson Servs. v. Serv-Tech, Inc.,* 879 S.W.2d 89, 108 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Determining unity of companies, the court can consider the "total dealings of the parent corporation and its subsidiary." *Harwood Tire-Arlington, Inc. v. Young,* 963 S.W.2d 881, 885 (Tex. App.—Fort Worth 1998, pet. dism'd). Plaintiff must prove it is necessary to hold the individual liable, as opposed to the corporate form, in order to avoid a substantial injustice to the plaintiff. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990).

A party seeking to pierce the corporate veil has a large burden to overcome, proving actual fraud, personal interest, and more. *Rimade,* 388 F.3d at 146-47 (protecting a defendant who had not taken a salary from a company for years, who lost money on loans, and who did not derive any direct personal benefit from any fraud).

Plaintiffs fail to meet their burden in this case to establish a claim for veil piercing based on a claim of alter ego. Clendenen and Heldt possess a financial interest or ownership in Debtor entities due to the money Heldt put in, and due to the company Clendenen owns that held stock in Debtors. Heldt, similar to the Defendant in *Rimade*, lost money on loans and did not appear to derive any direct personal benefit from any alleged fraud. Heldt was owed over $400,000 by Debtor entities and he did not make many day-to-day decisions. Geissler does not own the corporation, he is merely an employee and is not a shareholder. 1:36.

A better claim for alter ego is based on Clendenen's company stock ownership interest in Debtor entities. Clendenen is not a shareholder of any of the Debtor corporations. 2:128. He does own a corporation that is a shareholder in these corporations, but he personally is not a shareholder, and his company did not become a shareholder until three years after the lawsuit was filed. 2:128-29. The corporation Clendenen owns, Frisco Finance Corporation,

received a consulting fee of "10,000 a month" and it paid Clendenen "5,000 personally per month." 2:74. Clendenen is Frisco Finance Corporation's sole employee and its expenses solely consist of approximately $3,000 in accounting expenses, Clendenen's salary, and bonuses. 2:74-75. Frisco owns 35 percent of each Debtor entity and Mr. Heldt owns 65 percent of each debtor entity. 2:128. Before 2008, Antone's was owned 80 percent by Bamba, which is owned by Heldt and CRT Corporation, and 20 percent by Cliff Antone. 2:129. It is unclear if Cliff Antone owned his 20 percent interest at the time the Plaintiffs' claim was raised. Prior to 2008, Heldt owned Clef and Texas Music Group 100 percent. 2:129-30.

Furthermore, no evidence was offered by Plaintiff that Clendenen caused any of the Debtor corporations to be used for the purpose of perpetuating a fraud for the direct personal benefit of Clendenen. Whether Clendenen is a shareholder to whom the veil may be pierced, however, is moot as is demonstrated below by the discussion on "Section 21.223 of the Texas Business Organizations Code." As such, Clendenen cannot be held liable to Plaintiffs under any piercing the corporate veil theory.[15]

D.     Section 21.223 of the Texas Business Organizations Code

Defendant Heldt raises several additional objections to Plaintiffs' contention that the corporate veil may be pierced. First, Heldt argues that Plaintiffs' First Supplemental Petition does not meet the requirements of Section 21.223 of the Texas Business Organizations Code, which constitutes the exclusive manner in which a shareholder can be held liable for corporate obligations. *Willis*, 199 S.W.3d at 272; ***Formosa Plastics Corp., U.S.A. v. Kajima Int'l, Inc.***,

---

[15] The same analysis of whether Heinz Geissler can be held liable under a piercing the corporate veil theory applies to Geissler and no liability may be applied to Geissler.

216 S.W.3d 436, 462 (Tex. App.—Corpus Christi 2006, pet. denied).[16]  The Texas Business Organizations Code became effective January 1, 2006.  The Business Corporation Act continued in effect until January 1, 2010 for corporations formed before January 1, 2006.  *Formosa*, 461 n. 7.  Heldt argues that Section 21.223 must be met in this case because it covers both contractual claims and ancillary torts and, therefore, actual fraud will need to be alleged rather than merely constructive fraud primarily for the direct personal benefit of the shareholder.  *Willis* at 272; *Menetti v. Chavers*, 974 S.W.2d 168, 174 (Tex. App.—San Antonio 1998, no pet.); *Aluminum Chemicals (Bolivia), Inc. v. Bechtel Corp.,* 28 S.W.3d 64, 68 (Tex. App.—Texarkana 2000, no pet.) (implying that Section 21.223 applies to fraud claims); *Harco Energy, Inc. v. Re-Entry People, Inc.,* 23 S.W.3d 389, 397 (Tex. App.—Amarillo 2000, no pet.); *U.S. ex rel. CMC Steel Fabricators, Inc. v. Harrop Construction*, 131 F. Supp.2d 882, 894 (S.D. Tex. 2000), *aff'd*, 61 Fed. App'x 120 (5th Cir. 2003).  Absent a showing that Clendenen, Heldt, or Geissler caused the Debtors to perpetuate an actual fraud, and that the Debtors did perpetuate an actual fraud for the personal benefit of either Clendenen, Heldt, or Geissler, the veil may not be pierced in regards to any of those parties.  *See* Docket #51 "Randolph W. Clendenen's Trial Brief Regarding Piercing the Corporate Veil", p. 5 (citing *Shaw,* 73 S.W.3d at 481; *Aluminum Chemicals,* 28 S.W.3d at 68 (Tex. App.—Texarkana 2000, no pet.).

The evidence at trial showed that (1) Heldt had no dealings or communications with Don Walser and/or Don Walser's representatives; (2) Heldt executed no contracts and made no representations at issue in this case; (3) Heldt took no active part in the day-to-day management of the Debtors during any relevant time period; and (4) Heldt had no awareness of the alleged nonpayment of royalties until being named in the present lawsuit and had no role

---

[16] Section 21.223 requires that for the corporate veil to be pierced there must be a showing that both: (1) the shareholder caused the corporation to be sued for the purpose of perpetrating an actual fraud and (2) the shareholder did perpetrate an actual fraud on the obligee for his own direct personal benefit.

concerning any decisions concerning payment of royalties to Don Walser.  The evidence is clear that Heldt did not cause the Debtors to engage in any of the complained of conduct with respect to the allegations in the Petition, and therefore Plaintiffs cannot support their piercing the corporate veil claim against Heldt.

The evidence shows that Heldt received no direct personal benefit through his affiliation and support of the Debtors.  *See Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.,* 237 S.W.3d 379, 388-89 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (denying piercing under Art. 2.21, the predecessor to Section 21.223 where evidentiary record failed to show what the shareholder did with misappropriated funds and there was no evidence of direct personal benefit).  Heldt correctly argues that "Plaintiffs have produced no evidence that Heldt diverted company profits, or any company funds for that matter, to his personal use."  In fact, the evidence at trial shows just the opposite -- that Heldt did not receive any compensation, dividends, or other amounts from the Debtors.  2:181, 3:65.  Moreover, even if Heldt paid corporate debts of Debtors from personal funds, the isolated incidents of payment do not support a finding of alter ego.  *See Solomon v. Greenblatt,* 812 S.W.2d 7, 19 (Tex. App.—Dallas 1991, no writ).

Given its broad scope, Section 21.223 applies to both contractual claims and ancillary torts.  *See Menetti,* 974 S.W.2d at 174 (applying to DTPA, fraud, and negligence claims); *Plas-Tex v. Dalton Jones,* 2000 WL 632677, at *4, n. 9 (Tex. App.—Austin 2000, pet. denied) (not designated for publication) (applying Section 21.223 to fraud and breach of fiduciary duty claims); *Aluminum Chemicals,* 28 S.W.3d at 68; *Harco,* 23 S.W.3d at 397 (fraud); *Formosa Plastics Corp.,* 216 S.W.3d at 462, n. 8 (which assumed, without deciding, that Art 2.21 [former 21.223 before codified in the Texas Business Organizations Code] applied to a

related fraud claim).   Federal courts likewise have held that Section 21.223 applies to both contract and related tort claims for veil-piercing purposes.  *See e.g.* **U.S. ex rel. CMC**, 131 F. Supp.2d at 894.

In this case, all of Plaintiffs' causes of action "relate to or arise from" the contractual obligations allegedly incurred by the Debtors under the Recording Agreement.  First, Section VI of the Petition asserts a claim for breach of contract to which Section 21.223 necessarily applies.   Second, Section VII of the Petition expressly seeks rescission of the Recording Agreement, which is simply a claim for a specific remedy for the alleged contractual violation.

Third, at Section VIII, Plaintiffs' claim there was a breach of a fiduciary relationship that "the contract created and governed," specifically because of "the element of trust necessary to accomplish the goals of the contract" and which the Debtors breached by failing to pay the royalties allegedly due under the Recording Agreement.  (Petition at ¶¶ 8.2, 8.3, 8.4 and 8.5.)  In addition, Plaintiffs' Pre-Trial Order states as a disputed factual issue: "[w]as there a formal fiduciary relationship between Don Walser and the Debtor Defendants as a result of the Debtor Defendants' *exclusive rights pursuant to the Recording Agreement*. . . ."  Plaintiffs' Pre-Trial Order, p. 18, ¶ 22.  The Plaintiffs, therefore, assert a breach of fiduciary duty claim that arises from an underlying contractual obligation, which falls squarely within the confines of Section 21.223.   Furthermore, courts have found that Section 21.223 applies to breach of fiduciary duty claims.  *See* **Plas-Tex, Inc.**, 2000 WL 632677 at *4, n. 9 (applying Section 21.223 to fraud and breach of fiduciary duty claims); *cf*, **Carter v. Goodman Group Music Publishers**, 848 F. Supp. 438, 445 (S.D.N.Y. 1994) (breach of fiduciary duty claim arising from failure to properly account for and pay royalties was merely a restatement of a breach of contract claim).

Fourth, Section IX of the Petition alleges fraud in the performance of the Recording Agreement, as Defendants are alleged to have made misrepresentations concerning the royalties due Plaintiffs pursuant to such agreement (Petition at ¶ 9.2). Significantly, courts have found that Section 21.223 also applies to fraud claims. *See Plas-Tex, Inc.,* 2000 WL 632677 at *4 n. 9 (applying Section 21.223 to fraud claim); *Harco Energy, Inc.*, 23 S.W.3d at 397 (fraud); *Formosa Plastics Corp.*, 216 S.W.3d at 462 n. 8 (which assumed, without deciding, that Art 2.21 [former 21.223 before codified in the Texas Business Organizations Code] applied to a related fraud claim).

Finally, at Section X of the Petition, Plaintiffs allege that they are entitled to the imposition of a constructive trust, because their "contract created and governed a special relationship . . . [arising] 'from the element of trust necessary to accomplish the goals of the contract.' (Petition at ¶ 10.2.) Likewise, in Plaintiffs' Pre-Trial Order, Plaintiffs apparently seek a constructive trust "on the proceeds and funds and recordings . . . in connection with the recordings of Don Walser *governed by the Recording Agreement."* Plaintiffs' Pre-Trial Order, p. 19, ¶ 25. Clearly, this claim also arises out of an alleged contract and, as such, Section 21.223 applies to govern whether the corporate veil can be pierced.

Simply put, despite any contention by the Plaintiffs to the contrary, all of Plaintiffs' causes of action "relate to or arise from" the contractual obligations stemming from the Recording Agreement. Therefore, to the extent Plaintiffs seek to hold Heldt liable on any of the above-listed claims, Plaintiffs' ability to pierce the corporate veil is governed exclusively by Section 21.223, and Plaintiffs must satisfy Section 21.223's stringent requirements.

Because Section 21.223 applies to all Plaintiffs' alleged causes of action, Heldt cannot be held individually liable under any theory that he is or was the "alter ego of the

corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory." TEX. BUS. ORG. CODE § 21.223(a).

## DAMAGES AND CONCLUSION

Damages discussed in the section on breach of contract above are the proper damages for this case because no claims survive from the Watermelon bankruptcy period. Actions for rescission, breach of fiduciary duty, and piercing the corporate veil are denied.

Damages for mental anguish and exemplary damages are not available in a breach of contract case. *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68 (Tex. 1997).

Reasonable attorney fees may be awarded to the Plaintiffs. "The award of reasonable attorney's fees to a plaintiff recovering on a valid claim founded on a written or oral contract preceded by proper presentment of the claim is mandatory." *See Always at Market Inc. v. Girardi*, 365 Fed. App'x 603, 608 (5th Cir. 2010); *In re Smith*, 966 F.2d 973, 978 (5th Cir. 1992) (citing *Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). As a general rule, the party seeking to recover attorney's fees carries the burden of proof. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991); (citation omitted). This burden includes the duty to segregate recoverable fees from those that are not recoverable. *See Stewart Title Guar. Co.*, 822 S.W.2d at 10-11; *Wood v. Component Constr. Corp.*, 722 S.W.2d 439, 444-45 (Tex. App.—Fort Worth 1986, no writ), *overruled on other grounds* by *Stewart Title Guar. Co.*, 822 S.W.2d at 11. The duty to segregate recoverable fees from those that are not recoverable must be kept in mind with this case, where it appears that Plaintiffs may recover attorney fees related to their breach of contract of claim, which succeeds, but they may not recover attorney fees related to other claims, which fail.

Damages in the amount of $28,161.41, plus pre-judgment interest in the amount of $1,025.15, plus attorney fees are awarded to the Plaintiffs.  Plaintiffs may file a motion pursuant to FED. R. CIV. PROC. 54(d)(2)(B) and Local Rule 7054 requesting payment of attorneys' fees as part of their claim.

# # #